**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. TDC 05-203 |
| WILLIAM KING, and ANTONIO MURRAY, | |
| Defendants | |

**GOVERNMENT'S POSITION REGARDING DEFENDANTS' MOTIONS
FOR COMPASSIONATE RELEASE RELIEF**

The United States of America, by and through undersigned counsel, hereby files this pleading setting forth its position regarding Defendants' Motion for Compassionate Release Pursuant To 18 U.S.C. § 3582(C)(1)(A)(I) (hereinafter "King's Motion" (ECF 174) and "Murray's Motion" (ECF 175). Both defendants seek Compassionate Release because of the lengthy sentences each are serving. They seek to do so as the result of multiple convictions under 18 U.S.C. § 924(c) and because of the COVID pandemic. King previously had COVID, was asymptomatic, and there is no medical indication of long-term harm. Murray was vaccinated on January 14, 2021. Neither COVID situation obviously rises to the level of extraordinary and compelling circumstances now and does not merit further individualized discussion. The government is responding to both motions in a consolidated fashion because both defendants have raised the so-called "stacking" 924(c) issue as a grounds for relief.[1]

---

[1] By relying solely on the "stacking" aspect of the FSA amendment, defendants seem to suggest that all consecutive 18 U.S.C. § 924(c) counts have been abolished by the First Step Act (FSA). Of course, this simply is not so. The FSA only abolished the stacking of the enhanced **25-year** mandatory minimum sentence for a subsequent 924(c) where a defendant has no prior 924(c) convictions. In other words, the defendant must have a final and complete 924(c) conviction before the 25-year mandatory minimum applies for a subsequent conviction. *See* 18 U.S.C. §924(c)(1)(A)(i). As discussed herein, the courts are still required to impose consecutive (i.e. "stacking") sentences for serial 924(c) charges in the same case.

1

Prior to addressing the legal and factual issues, the government respectfully requests that the importance of this prosecution and the pervading need to deter police misconduct not get lost in the complicated intricacies of federal sentencing jurisprudence discussed below.  This was not a routine violent crime case.  It is first and foremost a police corruption case of epic proportions involving multiple armed robberies committed by police officers in the line of duty.  The strong words of the Fourth Circuit in a more recent police corruption case out of Baltimore City apply of equal significance here:

> This is a particularly sad case.  The community places a noble trust  in police officers to define and enforce, in the first instance, the delicate line between the chaos of lawlessness and the order of the rule of law.  And when police officers breach that trust and misuse their authority, as here, a measure of despair infuses in the community, **tainting far more than do similar crimes by others.**  The officers' convictions and sentences in this case are just and necessary, and we can only hope for a renewed commitment to the trust that we place in police officers who discharge their duties well.

*United States v. Taylor*, 942 F.3d 205, 227 (4th Cir. 2019) (emphasis added).

The government respectfully asks the Court to consider the reductions requested here in the framework of the seriousness of these corruption offenses committed by the defendants and the longterm effect such conduct has on the community.  Both undersigned counsel and this Court are, of course, at somewhat of a disadvantage in understanding every detail of the case as neither participated in the 14-day jury trial of both men.  At the time, neither accepted responsibility for their actions.[2]  Both defendants express shame and remorse for their actions now and the government has no reason to doubt their sincerity.  However, their criminal conduct was egregious.

---

[2] This is not a case where the defendants simply exercised their rights to go to trial.  Rather, both overtly offered an outlandish defense, testifying falsely in their respective defenses:  "King and Murray maintained that their activities were all in furtherance of legitimate police activity in an effort to develop sources to lead to arrests of drug distributors above the street level individuals with whom they were interacting and that the proceeds of the activities were paid out to informants…."  *Id.*

This was not an ordinary serial armed robbery prosecution.  The need to deter like behavior is magnified many times in a case like this involving so deep a betrayal of the public trust.

### I.   The First Step Act, the *McCoy* decision, and multiple 924(c) convictions

As a preliminary  matter, it is the government's general position that this Court should summarily deny defendants' Motions because the Court does not have the power to grant relief as argued by the government in *United States v. McCoy*, __ F.3d __, 2020 WL 7050097 (4th Cir. Dec. 2, 2020).  The Government recognizes that in *McCoy* the Fourth Circuit recently found that district courts "are empowered … to consider any extraordinary and compelling reason for release that a defendant might raise" and that the catch-all category at U.S.S.G. § 1B1.13 cmt. n.1(D), which permits a sentence reduction if "there exists in the defendant's case an extraordinary and compelling reason other than" the listed reasons, is not limited to other reasons identified by BOP. The Government acknowledges that the mandate issued on January 22, 2021, and therefore, the holding in McCoy is controlling for this Court on this issue.  The government does not concede that the case was decided correctly, and we thus note our objections for purposes of any subsequent appeal in this case or others.

If the Court holds that the defendants are entitled to pursue this avenue for relief in light of *McCoy*, the Government recognizes that there are factors that could *collectively* establish an extraordinary and compelling reason *in this particular case* for *some* reduction of the multiple, consecutive 25-year sentences reluctantly imposed by Judge Motz.  One factor in that analysis, as discussed below and as the defendants argue, is to avoid sentencing disparity.[3]  However, disparity of sentences standing alone is not an extraordinary and compelling reason to reduce a sentence.

---

[3] Pursuant to 18 U.S.C. § 3553(a)(6), the district courts must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *United States v. Clark*, 434 F.3d 684, 686 (4th Cir. 2006).

*United States v. Wilson*, No. CR 14-209-1, 2020 WL 7872628, at *6-7 (E.D. Pa. Dec. 31, 2020).

The court in *Wilson* explained:

> In December 2018, Congress amended section 924(c) to ensure the twenty-
> five-year consecutive term for a successive 924(c) offense does not apply
> unless the defendant had a previous, final section 924(c) conviction at the
> time of the offense….Despite the sentence disparities between those
> sentenced before and after the First Step Act, Congress declined to make
> this change to section 924(c) retroactive…We have no basis today to find
> the disparity of sentences alone is an extraordinary and compelling reason
> to reduce a sentence.

*Id.  See also United States v. Harris*, No. 97-399, 2020 WL 7861324 (E.D. Pa. Dec. 31, 2020)

(after consideration of statutory language, legislative intent, and recent case law – district courts

can consider the change in sentencing for section 924(c) offenses as a factor in our individualized

compassionate release inquiries.  But the amendment to section 924(c) could not singularly

constitute an extraordinary and compelling reason warranting compassionate release.)

Indeed, the *McCoy* decision itself was not so broad as to allow that its holding applies

indiscriminately to any claim of an alleged sentencing disparity.  Such a broad application of

extraordinary and compelling reasons would unleash the very "Wild West" scenario that Judge

Easterbrook of the Seventh Circuit decried in his recent holding in *United States v. Gunn*:

> [W]e do not see the absence of an applicable policy statement as creating a
> sort of Wild West in court, with every district judge having an idiosyncratic
> release policy … The statute itself sets the standard: only "extraordinary
> and compelling reasons" justify the release of a prisoner who is outside the
> scope of § 3582(c)(1)(A)(ii).  The substantive aspects of the Sentencing
> Commission's analysis in § 1B1.13 and its Application Notes provide a
> working definition of "extraordinary and compelling reasons"; a judge who
> strikes off on a different path risks an appellate holding that judicial
> discretion has been abused.  In this way the Commission's analysis can
> guide discretion without being conclusive.  *Cf. Gall v. United States*, 552
> U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).

*United States v. Gunn*, 980 F3d 1178, 1180 (7th Cir. 2020).  Therefore, of course, the courts should

not apply *McCoy* across the board to every case involving "stacked" § 924(c) convictions.  That

4

would literally open the floodgates to federal litigation and re-sentencings.  Moreover, it is not appropriate because, as noted above, if it were Congress' intent to do so, it would have made the Section 924(c) amendments to the FSA retroactive.

The government submits that this court must find more than sentencing disparity to justify a finding of "extraordinary and compelling reasons" to reduce defendants' sentences.  As will be discussed below, other factors that affect the analysis of whether there are "extraordinary and compelling reasons" to reduce a sentence in the procedural posture here and the degree to which a reduction should be granted include the defendants' behavior in prison, efforts at rehabilitation, work and service, and the nature and seriousness of the underlying criminal conduct.   These other factors must be identified and considered in the analysis of whether there are "extraordinary and compelling reasons" to reduce a sentence in the procedural posture here <u>and</u> the degree to which a reduction should be granted. Here, the government contends, that reduction should not be in the degree sought by defendants in their motions but, as described below, *only* to the extent a similarly situated defendant, if convicted today, would be sentenced.

## II.    Procedural and Factual Background

According to the appellate decision affirming the conviction and sentences, *United States v. King,* 270 F. App'x 261, 263-65 (4th Cir. 2008), the following evidence was introduced at trial:

> From 2004 until their arrest on May 16, 2005, King and Murray were employed as detectives by the Baltimore City Police Department and worked primarily in the Public Housing Drug Enforcement Unit, concentrating on drug enforcement in public housing and surrounding areas in Baltimore City.
>
> While working as police detectives, King and Murray conspired with Antonio Mosby ("Mosby"), and others not named in the indictment, to rob drug traffickers on the streets of Baltimore City. Mosby and others would identify persons on the street who were in possession of narcotics and proceeds from the sale of narcotics. Mosby would then contact King and Murray, who would detain these persons under guise of police activity. During the course of the detention, and while armed with their service

weapons, King and Murray threatened arrest and prosecution, took control of controlled substances, including cocaine base, heroin, and marijuana, and the proceeds from the sale of such controlled substances, from these persons. After the robberies, King and Murray distributed the seized narcotics to Mosby and others to sell on the street. The evidence demonstrated that King and Murray would split the profits from the sale of narcotics, as well as any proceeds recovered from the person they had detained. At trial, King and Murray maintained that their activities were all in furtherance of legitimate police activity in an effort to develop sources to lead to arrests of drug distributors above the street level individuals with whom they were interacting and that the proceeds of the activities were paid out to informants, principally Mosby.

Mickey Harvey testified at trial that he was arrested by King in 2003 after King pulled out his gun, *put it to Harvey's head*,[4] and detained Harvey in King's police vehicle. Harvey testified that he was released without charges and thereafter began to work with both King and Murray. Harvey would spot drug dealers and notify King and Murray of the dealers' locations.

King and Murray would then detain these individuals, rob them of their drugs and drug proceeds, give the stolen drugs to Harvey to sell, and split the stolen proceeds among them as King and Murray deemed appropriate. Davon Mayer testified that King arrested him in 2003 and released him without charges. Mayer agreed to work for King by locating drug stashes on the street which King could steal. King would then either sell the drugs to Mayer, or Mayer would take the drugs and sell them, splitting the proceeds with King. Mayer ultimately went to the Federal Bureau of Investigation ("FBI") with information about King, and agreed to cooperate with the FBI.

Mosby attested that he also was arrested in 2003 by King and Murray. He testified that both King and Murray were armed when they placed him into their police car.

Mosby was released without charges and began working with King and Murray by identifying drug dealers for King and Murray to rob and locating drug stashes for them to steal. Mosby would call King and Murray with a description of the dealers, and they would drive up in their police vehicle, physically detain the dealers on the street or in the car, search them, and take their money and drugs. After the robberies, King and Murray would meet with Mosby and usually sell the stolen drugs to Mosby for one-half

---

[4] This testimony challenges defendant Murray's contention that, "Importantly, there was no evidence presented that Mr. Murray or Mr. King ever physically injured anyone or drew their service weapons while participating in this scheme."  Murray Motion at 4.

the street value of the drugs. Mosby would, in turn, sell the drugs, making a 100 percent profit.

During trial, and during their own testimony, neither King nor Murray disputed that they were armed with loaded service revolvers during these street encounters. The Government introduced evidence that, on April 7, 2005, King and Murray picked up Mosby in anticipation of robbing drug dealers. When King realized that he did not have his service revolver, he and Murray drove back to the police station to pick up the weapon. After retrieving the weapon, they met with Mosby and resumed their activities.

*Id.* (emphasis supplied).

Notably, the Fourth Circuit rejected defendants' constitutional complaints, including a claim under the 8th Amendment cruel and excessive punishment clause, about the sentence.[5]  *Id.* at 4.  The Fourth Circuit also rejected defendants' challenge that the firearms they possessed were not in furtherance of the robberies because they "legally" possessed the guns in their jobs as police officers:

We find that the distinction Appellants attempt to make is both disingenuous and without a difference. While they may legally have possessed their service weapons for protection, intimidation, and to embolden them during the commission of legitimate police activities, the possession of those same firearms did not suddenly cease to be protection, intimidation, or emboldening devises during their commission of illegal activities. Moreover, the Government introduced testimonial and tape-recorded evidence that demonstrated clearly that, on April 7, 2005, King and Murray interrupted their illegal activities to recover King's firearm before continuing with such activities. This evidence, together with the plethora of evidence that Appellants possessed their weapons in plain view of those from whom they stole drugs and drug proceeds, fully supports the

---

[5] "We find Appellants' challenges to the imposition of consecutive 25-year sentences on each § 924(c) conviction…as unavailing, as such sentences were mandated by law, were not unconstitutional, and were properly imposed.  There is no question in this case that Appellants committed different robberies on separate occasions, distributed or possessed with the intent to distribute drugs on separate occasions, and possessed firearms in furtherance of a crime of violence or a drug trafficking crime on each of those occasions. As such, the imposition of consecutive sentences for each § 924(c) count is mandated by Congress, consistent with the plain language of § 924(c), and does not offend constitutional rights and principles set forth in the Fifth or Eighth Amendments."

jury's finding that Appellants possessed their firearms in furtherance of
their crimes.

*Id.* at 5.

But with the First Step Act (FSA) amendments, admittedly it is a new landscape for federal

sentencing under Section 924(c).  Here, defendants were convicted after trial of multiple 924(c)

counts.  More than 90% of federal defendants accept responsibility rather than go to trial and it is

certainly more common for a plea agreement to incorporate a single 924(c) count rather than

multiple counts in a case.  https://www.uscourts.gov/about-federal-courts/types-cases/criminal-
cases.  This is particularly so where, as here, there was no physical injury to the victims.  On the

other hand, there are far less police corruption cases than robbery cases.  Regarding the latter, there

is an extraordinary and compelling need that should be weighed to deter police misconduct and to

not treat law enforcement defendants more favorably than lay citizen defendants.  Accordingly,

the government turns now to other factors that together could constitute "extraordinary and

compelling" reasons for a reduction in this case – were the court to adopt the *McCoy* ruling – and

that also guide the government's recommendation as to the degree of that reduction.

### III.   If this Court Finds Extraordinary and Compelling Reasons Exist that Warrant Sentence Reductions, the Court Should Not Reduce the Defendants' Sentences to Time Served.

The *McCoy* court and the district courts below all considered multiple factors in

determining that the defendants in those consolidated appeals presented extraordinary and

compelling reasons for compassionate release.  *See McCoy*, 981 F.3d at 288.  In finding that the

district courts appropriately exercised their discretion, in *McCoy*, the Court explained:

> The courts took seriously the requirement that they conduct individualized
> inquiries, basing relief not only on the First Step Act's change to sentencing
> law under § 924(c) but also on such factors as the defendants' relative
> youth[6] at the time of their offenses, their post-sentencing conduct and

---

[6]  The *McCoy* defendants were youthful offenders; Murray and King were not.

rehabilitation, and the very substantial terms of imprisonment they already
served.

*Id.*[7]  Other courts have similarly held the 924(c) change in sentencing law, *when combined with other factors*, can constitute an extraordinary and compelling reason for a sentence reduction.  The court must ask itself if extraordinary and compelling circumstances that distinguishes certain defendants are present here.

For example, in granting compassionate release in *Harris*, 2020 WL 7861324 at 2, the court found the petitioner presented other factors supporting his release which, when combined, constituted extraordinary and compelling reasons.  For example, the petitioner productively spent his over twenty-three years in prison by working as a sewing machine operator, participating in numerous courses and workshops, and avoiding serious disciplinary infractions for thirteen years. The petitioner had also served over seventy percent of his sentence, which weighed in favor of finding extraordinary and compelling reasons for his release.  *Id.*

In *United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at *2 (E.D. Pa. July 24, 2020*)*, the petitioner:

> (1) completed over one-hundred BOP educational programs; (2) received a
> certification as an offender work force development specialist; (3) created
> and facilitated prison reentry programs that have been added to the BOP's
> course catalog; (4) coordinated reentry summits and seminars at FCI
> McKean; (5) conducted presentations about criminal justice reform with
> academics and government officials; (6) obtained certification as a life
> coach through the Institute for Life Coach Training; (7) co-designed and
> facilitated victim impact courts with an academic member at the University

---

[7]  Both Murray and King's drug sentences (not the robberies) were reduced in 2014 pursuant to 18 U.S.C. § 3582(c), as the applicable guideline range for crack cocaine related offenses had been lowered and made retroactive under 28 U.S.C. §§ 944(o),(u).  The government is unsure how the Court adjusted the sentence for the drugs while not taking into account the guidelines for the multiple armed robberies that remained unaffected by the crack cocaine reduction law.

of Pittsburgh; and (8) taught educational courses to other prisoners. . . [Petitioner] maintained a blemish-free disciplinary record since 2003. …[L]etters of recommendation submitted on [petitioner's] behalf— including many from employees within the Department of Justice—are also telling of his rehabilitation….[the] former warden wrote a four-page letter stating that [petitioner] "serves as a mentor to numerous individuals," has "exceptional job performance," and his "efforts to transform his life to a positive, productive one [are] sincere."

*Id.*

In *United States v. McDonel*, No. 07-20189, 2021 WL 120935, at *5 (E.D. Mich. Jan. 13, 2021), the court granted compassionate release to a youthful robber who became a

model inmate and has demonstrated a determination to turn his life around…He spent over 500 hours in education courses and graduated from the "The 7 Habits of Highly Effective People" in May 2016.

The burden is always on the inmate to show "extraordinary and compelling reasons." *See, e.g., United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (construing relief sought under § 3582(c)(2)). In their motions, the only other factor apart from sentencing disparity that the defendants point to here is their remorse (they are sorry for what they did) and they have clean disciplinary records (which is expected of federal inmates). Counsel also have advised undersigned counsel that, in 2017, both defendants expressed a willingness and desire to former Fourth Circuit judge Andre Davis, in his then-capacity as City Solicitor for Baltimore, to address recruits for the Baltimore City police department about the disastrous consequences of their criminal conduct. Though the presentations never happened, the overture was meaningful and, in undersigned counsel's view, should be revisited. Government counsel was provided with a few, albeit eloquent, character letters and King attached a number to his motion.[8] Neither defendant has articulated additional reasons to support their request for "extraordinary and compelling"

---

[8] The letter written by an FCI Atwater correctional officer on behalf of King was particularly strong. King's Motion at Exh D.

relief.

Nor does their respective BOP paperwork[9] immediately distinguish their prison conduct. For example, Petitioner Murray only availed himself of educational opportunities recently (in late 2020), and according to BOP, went years without taking a single class:

| Education Courses | | | |
|---|---|---|---|
| SubFacl | Action | Description | Start |
| EDG | C | CORRESPONDENCE PROBLEM SOLVE | 12-07-2020 |
| EDG | C | CORRESPONDENCE REENTRY | 11-16-2020 |
| EDG | C | CORRESPONDENCE POSITIVITY | 10-26-2020 |
| EDG | C | CORRESPONDENCE VALUES/GOAL | 10-02-2020 |
| EDG | C | ACE ANGER MANAGEMENT | 07-06-2020 |
| EDG | C | SHU PERSONAL DEVELOPMENT | 06-17-2020 |
| EDG | C | SHU MONEY MANAGEMENT SKILLS | 05-13-2020 |
| EDG | C | SHU ACE: EMPLOYMENT SKILLS | 04-28-2020 |
| OAD RHU | C | ABDOMINAL | 11-18-2015 |
| FLP | W | INTERMEDIATE GED M-F 2-3:30 | 02-27-2009 |
| FLP | W | GED MARTINEZ 2:00PM | 12-22-2008 |

There are uncompleted goals in his record – reflecting more to be done toward his rehabilitation:

| Next Program Review Goals |
|---|
| Enroll Correspondence Decision Making and Community Counseling. Establish a family and community contact via email, letter, or telephone. Enroll in organized hobby craft/recreational sport offered by Recreational staff. Practice good hygiene, healthy eating habits, and cell sanitation. Engage in accurate self-appraisal by acknowledging and correcting irrational thinking and behavior patterns and actively participate in self-help programs. Remain disciplinary free. Save $100.00 a month for release purposes. Consult with medical and psychology as needed. |

To his credit, Petitioner King completed more programs over a consistent period since his imprisonment and earned an outstanding work performance rating from the BOP.

| Education Courses | | | | |
|---|---|---|---|---|
| SubFacl | Action | Description | Start | Stop |
| BEN | C | ACE-ANGER MANAGMENT-RPP#6 | 01-06-2020 | 02-03-2020 |
| BEN | C | ACE-REAL ESTATE BASICS-RPP#6 | 01-06-2020 | 02-03-2020 |

---

[9] The paperwork has been provided to counsel and is available to the court upon request.

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BEN | C | HOW TO IN CAR DEALERSHIP | 01-06-2020 | 02-03-2020 |
| BEN | C | REC/RPP6 BEGINNING CERAMICS | 03-04-2019 | 04-17-2019 |
| BEN | C | REC/RPP6 BEGINNING CERAMICS | 08-27-2018 | 10-08-2018 |
| BEN | C | BREAK OLD HABITS ACE CLASS | 10-19-2017 | 12-14-2017 |
| FLF | C | ADV BUILDING TRADES M-F 7-3 | 08-11-2016 | 12-21-2016 |
| FLF | C | VT BUILDING TRADES  M-F 7-3 | 04-18-2016 | 08-09-2016 |
| FLF | C | REC RUNWALK 1630 | 05-23-2016 | 07-14-2016 |
| FLF | C | OT WIND ENERGY | 01-19-2016 | 03-30-2016 |
| FLF | C | ENERGY/SOLAR MON-FRI 6-8 PM | 04-04-2016 | 06-08-2016 |
| FLF | C | OT RENEWABLE ENERGY/M-R 6-8PM | 03-30-2016 | 04-15-2016 |
| FLF | C | INTER CALISTH VAR TIME | 01-04-2016 | 02-25-2016 |
| FLF | C | ADV VT CABINETMAKING M-F 7-3 | 08-21-2015 | 12-09-2015 |
| FLF | C | VT CABINETMAKING M-F 7-3 | 04-01-2015 | 08-20-2015 |
| FLP | W | CUSTODIAL HOUSEKEEPING | 08-15-2013 | 02-19-2014 |
| ATW | C | BASKETBALL OFFICIATING USP | 12-18-2011 | 01-16-2012 |
| ATW | C | FILM/FINE ARTS APPRECIATION | 01-14-2008 | 03-17-2008 |
| ATW | C | OFFICE AUTOMATION-COLLEGE | 07-02-2007 | 08-30-2007 |
| ATW | C | BEGINNERS CROCHET CLASS USP | 03-13-2007 | 04-18-2007 |

INMATE KING 41870-037 HAS THE ABILITY AND SKILLS TO ACCOMPLISH ALL TASK THAT ARE ASKED OF HIM. DURING THE GLOBAL COVID-19 PANDEMIC INMATE KING ROSE TO THE OCCASION, INMATE KING FOLLOWED THE GUIDANCE THAT WAS DELIVERED TO HIM BY THE SAFETY DEPARTMENT AND ADAPTED TO THE SITUATION. HE MADE SURE HE WORE HIS PPE AS RECOMENDED. AND MADE SURE THE DEPARTEMENT MEET THE HIGHEST LEVELS OF SANTATION DAILY.

But neither petitioner appears to have truly distinguished themselves in prison and both still have large (over $1,000) outstanding financial obligations (presumably the result of the special assessments imposed at the time of sentencing).

Apart from their respective COVID arguments, which are completely negated by their personal situations, their focus for relief set forth in the motions relies almost exclusively on the FSA Section 924(c) amendment and their respective good conduct records.  There is much a prisoner can do in prison to rehabilitate themselves *and* make an impact on other people other than simply following the rules.  Following the rules is not only expected of them but of personal benefit since it affects their good time credit. More is needed to stand out as extraordinary and compelling. Indeed, the law states, "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 18 U.S.C. § 944(t).  And there is a difference, of course, between rehabilitation and helping others.

This leads to the government's recommendation here.  Both defendants are unquestionably serving lengthier sentences that would not be imposed on a current offender.  In Section 403 of the FSA, effective December 18, 2018, Congress amended Section 924(c) to provide that the 25-year consecutive term for a successive 924(c) offense does not apply unless the defendant had a

previous, final conviction for a 924(c) charge at the time of the offense.  And that is certainly not this case -- neither defendant, both police officers, had prior criminal records, much less a prior firearm conviction.

Nonetheless, under current law, both defendants would still face a five-year consecutive sentence on each 924(c) conviction.  That is, the statutory requirement still applies that each such sentence must run consecutively to each other and to any other sentence imposed.  That means the mandatory minimum sentence on multiple 924(c) counts, if charged today in the same initial 924(c) prosecution, would be as follows:

Murray was convicted after trial of 6 counts under 18 U.S.C. § 924(c) for a total of 30 years consecutive to the sentence imposed for the underlying offense conduct.  Hence, even if Judge Motz varied completely (which he did not) to imposing only 1 day on the non-924(c) counts, the lowest sentence Judge Motz could have imposed if the law then was the same as the law now is 30 years and one day.   Similarly, King was convicted after trial of 13 counts under 18 U.S.C. § 924(c) for a total of 65 years consecutive to the underlying offense conduct. Hence, the lowest sentence Judge Motz could have imposed if the law then was the same as the law now is 65 years and one day. These would be the sentences required by law if the defendants were sentenced in 2021.   Neither sentence is unreasonable given the offense conduct in this case.  While neither defendant has even served most of that hypothetical lesser sentence now, both would be entitled to substantial good time credit[10] from the lesser sentences.

---

[10] The FSA amended 18 U.S.C. § 3624(b) so that federal inmates can earn up to 54 days of good time credit for every year of their imposed sentence rather than for every year of their sentenced served. For example, this change means that an offender sentenced to 10 years in prison and who earns the maximum good time credits each year will earn 540 days (1.47 years) of credit.  For example, approximately 4.5 years would be subtracted from a 30-year sentence.

## IV. The § 3553(a) Factors

The vast variant sentence, which would provide a windfall to these two corrupt police officers not available to currently similarly situated defendants, should also be denied after consideration of the factors set forth in 18 U.S.C. § 3553(a).  Arguably more than any other type of case, it is essential to the integrity of the criminal justice system in a police corruption case to ensure strict compliance with the statutory factors.  The sentence must "reflect the seriousness of the offense… promote respect for the law, and [] provide just punishment for the offense."  The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.  Insofar as sentencing disparity, the court can look to a recent case of similarity severity – albeit one where the defendant did accept responsibility rather than offer a false, perjurious defense at trial.  In *United States v. Jenkins*, CCB Crim Case Nos. 17-106 and 17-638, Judge Blake sentenced the defendant to 25 years in prison.  Like Murray and King, Jenkins was a corrupt Baltimore City police officer who committed various similar crimes (drug trafficking, robberies) in the line of duty.

Both defendants, having served approximately 15-16 years of their respective sentences, ask this court to release them now. This drastic relief is neither just nor justified.  Here, the seriousness of the instant offense when coupled with the need for the ultimate deterrence of police misconduct weighs against reducing the defendants' sentences to time served.  Accordingly, should this court follow *McCoy* and consider the merits of the pending motions, the government respectfully submits that a reduction is merited but that the court should only reduce the sentence to the extent that it would be lawful for serial 924(c) convictions if before the court as a matter of first impression now.  Specifically, that petitioner Murray be sentenced to no less than a period of

imprisonment of 30 years plus 1 day and petitioner King be sentenced to no less than 65 years[11]

plus 1 day with all other terms and conditions of the judgment and commitment order unmodified.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/

By: _____

Sandra Wilkinson
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street
Baltimore, Maryland 21201

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2021, a copy of the foregoing will be e-mailed to counsel of record for the defendants:

Steven H. Levin
Rosenberg Martin Greenberg, LLP
SLevin@rosenbergmartin.com

Andrew C. White
Silverman, Thompson, Slutkin & White, LLC
awhite@mdattorney.com

_____/s/_____
AUSA Sandra Wilkinson

---

[11] The government understands that King and Murray were somewhat similarly situated in this case and hence, the same sentence for both may avoid sentencing disparity issues occasioned by the consecutive 924(c) counts.